**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BEYOND NUCLEAR, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF ENERGY, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 16-cv-1641 (TSC)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

This case concerns the U.S. Department of Energy's ("DOE") obligation under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, to publish an environmental impact statement ("EIS") prior to taking any action that may significantly affect the quality of the environment.  Before the court is the question of whether DOE violated NEPA by not preparing a supplemental EIS ahead of its planned transportation of 6,000 gallons of highly-enriched uranyl nitrate liquid ("HEUNL") from Chalk River, Ontario, Canada to the Savannah River Site in South Carolina.  Plaintiffs are seven environmental advocacy groups who contend that DOE's reliance on past EISs and publication of two supplement analyses is not sufficient under the agency's NEPA requirements.  The parties jointly agreed to an accelerated summary judgment briefing schedule and hearing ahead of DOE's planned February 2017 commencement of the transportation.  Pursuant to that schedule, Defendants moved for summary judgment on November 4, 2016, and Plaintiffs cross-moved for summary judgment on November 22, 2016.  The court heard oral argument on the motions on January 18, 2017.

Upon consideration of the parties' motions and the administrative record, Defendants'

motion is GRANTED and Plaintiffs' cross-motion is DENIED.  Defendants' motion to strike the extra-record materials submitted by Plaintiffs is also GRANTED, and Plaintiffs' motion to supplement the record is therefore DENIED.

## I.   BACKGROUND

### A.   Requirements of NEPA

Before the DOE, or any federal agency, engages in activity that may "significantly affect[] the quality of the human environment," NEPA requires it to prepare "a detailed statement" on "the environmental impact of the proposed action," as well as any potential alternative actions that may be taken.  42 U.S.C. § 4332(2)(c)(i)–(v).  DOE must thus take a "hard look" at environmental consequences before moving forward on a major administrative action.  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).  The purpose of this requirement is to ensure "'a fully informed and well-considered decision, not necessarily' the best decision." *Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). The statute sets procedural requirements, but does not mandate certain outcomes.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.").

DOE's NEPA obligations, like those of all federal agencies, are guided by the Council on Environmental Quality's ("CEQ") regulations at 40 C.F.R. §§ 1500–08, as well as DOE's own regulations at 10 C.F.R. § 1021.  These regulations, for example, require DOE to issue a Record of Decision ("ROD") upon completion of an environmental impact statement, stating its decision, alternatives considered, factors balanced by the agency, and whether all practicable

means to avoid or minimize environmental harm from the selected alternatives had been adopted or why not.  40 C.F.R. § 1505.2.  The regulations also require agencies to solicit public comments on proposed actions while preparing an EIS.  *See* 40 C.F.R. §§ 1503.1, 1501.4(b), 1506.6.  At issue here is the DOE's obligation to supplement an EIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(i), (ii); 10 C.F.R. § 1021.314(a).

### B.    DOE's Planned Transportation of Highly Enriched Liquid Uranium

This case concerns the planned transportation of "target material," which is the residual substance that remains after highly-enriched uranium targets are irradiated in a research reactor, removed, and dissolved in a nitric acid solution to recover molybdenum-99, which decays into a radioisotope used in medical applications such as cancer diagnosis and treatment.  (AR 0026360).  The specific terminology used by DOE and other agencies reflects important differences in categories of material, many of which have statutory definitions.  Plaintiffs at times refer to the target material at issue as "nuclear waste," "toxic liquid stew," "highly-radioactive liquid waste," or "a form of spent fuel."  DOE clarifies that these terms are either meaningless in a technical sense or have specific definitions that do not include target material.[1]

---

[1] Spent nuclear fuel is the "fuel that has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing," 42 U.S.C. § 10101(23), and while spent nuclear fuel comes in many forms, including plates, tubes, pins, or rods, target material is not one such form, but something else entirely.  DOE also clarifies that while Plaintiffs' term "highly-radioactive liquid waste" has no technical definition, the term "high-level radioactive waste" is a technical term defined as including "the highly radioactive material resulting from the reprocessing of spent nuclear fuel" or "other highly radioactive material that the [Nuclear Regulatory Commission] . . . determines by rule requires permanent isolation."  42 U.S.C. § 10101(12).  The definition of high-level radioactive waste

Under the DOE's acceptance policy, the agency accepts shipments of spent nuclear fuel and target material containing U.S.-origin uranium from foreign research reactors and then manages that uranium at facilities in the United States. *See* 61 Fed. Reg. 25,092–103 (May 17, 1996). This program is part of a larger effort, dating back to 1950s, in which the United States has provided highly enriched uranium to foreign nuclear research reactors conditioned on the promise to not develop nuclear weapons, then later accepted the spent nuclear fuel and target material back from those foreign reactors to avoid the stockpiling of nuclear material in foreign countries and to ensure the safe processing and maintenance of the material in the United States. *Id.* at 25,092–93. Pursuant to this acceptance program, DOE intends to accept 6,000 gallons of target material from Ontario and transport it to the Savannah River Site in South Carolina for processing and storage. (AR 0026361, 0027336).

Between 1995 and 2000, DOE issued three environmental impact statements and Records of Decision ("ROD") in support of this Acceptance Program. The first ROD was issued in 1995 and included the "Programmatic Spent Nuclear Fuel Management and Idaho National Engineering Laboratory Environment and Waste Management Programs EIS" (the "1995 EIS"). (AR 0001570; 60 Fed. Reg. 28,680 (June 1, 1995)). The 1995 EIS assessed the potential environmental impacts of the transportation, receipt, processing, and storage of spent nuclear fuel, and the receipt and storage of aluminum-clad target material, at the Savannah River Site in South Carolina. Next, in 1996, DOE and the Department of State jointly issued the "Proposed Nuclear Weapons Nonproliferation Policy Concerning Foreign Research Reactor Spent Nuclear Fuel EIS" (the "1996 EIS"), which was "tiered from," or based on, the 1995 EIS and also

_____

also includes "liquid waste produced directly in reprocessing [of spent nuclear fuel] and any solid material derived from such liquid waste that contains fission products in sufficient concentrations," but this definition does not include target material, which is not waste. *Id.*

considered the transportation, receipt, and storage of about 18.2 metric tons heavy metal of aluminum-clad spent nuclear fuel and about 0.6 metro tons heavy metal of target material to the Savannah River Site.  (AR 0007903–9098).  This 1996 EIS supported DOE's ROD that year establishing the ten-year Acceptance Program.  61 Fed. Reg. 25,092 (May 17, 1996).

Finally, in 2000 DOE issued the "Savannah River Site Spent Nuclear Fuel Management EIS" (the "2000 EIS"), which considered alternatives for the management, storage, and disposal of aluminum-clad spent nuclear fuel and target material at the Savannah River Site, and adopted an alternative using both a new melt-and-dilute technology and conventional processing for the uranium received there.  (AR 0011537; 65 Fed. Reg. 48,224 (Aug. 7, 2000)).  In 2004, approaching the conclusion of the ten-year Acceptance Program, DOE prepared a Supplement Analysis to determine whether a supplemental EIS was necessary to extend the program, and determined that extension would not constitute a significant change, so no supplemental EIS was required.  (AR 0017883–914; 69 Fed. Reg. 69,901 (Dec. 1, 2004)).

The uranium transport at issue in this litigation would bring 6,000 gallons of target material from Ontario to the Savannah River Site by truck on land.  (AR 0027336).  The primary difference between this plan and that analyzed in the 1996 EIS is that the target material considered in 1996 was in the form of loose oxide powder (i.e., a solid) while here it is in the form of a uranyl nitrate liquid solution (i.e., liquid).  (AR 0026366–68).  Essentially all other aspects of the plan, including the source location, the use of trucks carrying casks over land, the potential routes used, and the storage at the Savannah River Site are the same.  DOE seeks to accept and transport liquid target material because it was notified in 2008 by Atomic Energy of Canada, Ltd., the Canadian agency overseeing the nuclear material in that country, that certain constraints precluded taking the additional step of converting the target material to solid form

after it was dissolved in the nitric acid solution.  (AR 0024238).  In 2012, DOE agreed to consider acceptance of liquid target material, and the two agencies signed a contract to take steps necessary to determine whether such acceptance would be possible.  (AR 0026260–79).

In March 2013, DOE issued a Supplement Analysis (the "2013 SA") to consider whether acceptance and transportation of liquid target material from Canada required supplementation of the 1995 EIS, 1996 EIS, or 2000 EIS.  (AR 0026359–94).  The 2013 SA stated that DOE's acceptance of the material would depend on whether the specific casks designed to hold the target material (referred to as NAC-LWT casks) were certified, and would be subject to the regulatory requirements of the U.S. Department of Transportation and Nuclear Regulatory Commission as well as DOE approval of the plans for transportation and security.  (AR 0026367).  DOE reviewed and evaluated, including by updating its risk assessment methodology, any potential human health effects that would result from transportation of the target material in liquid, rather than solid, form.  (AR 0026379–93).  The 2013 SA also included analysis of the risks of sabotage and terrorism during and after transport of the target material, for which DOE had previously prepared a similar EIS (the "Yucca Mountain EIS").  (AR 0026369–70, 0026388).  DOE concluded that the potential impacts of transporting target material in liquid form would not be significantly different from the risks of transporting target material already evaluated in the 1996 EIS, and therefore under the CEQ's regulations neither a supplemental EIS nor a new EIS were required.  (AR 0026371–72).  The 2013 SA reached the same conclusion with respect to whether to use conventional processing of the target material at the Savannah River Site as opposed to the melt-and-dilute technology selected by earlier EISs.

Transportation of the liquid target material required development of a specialized container.  The vendor tasked with making this container, NAC, proposed configuring special

"HEUNL containers," four of which would fit into the standard NAC-LWT casks already used for transport of target material.  (AR 0026411–911).  The Nuclear Regulatory Commission issued a Certificate of Compliance for the new container plan in 2014, certifying that it met the applicable safety standards at 10 C.F.R. part 71.  (AR 0027047, 0027079–105).  The Department of Transportation issued its own Competent Authority Certification in 2015, certifying that the transport package met the applicable U.S. and International Atomic Energy Agency standards.  (AR 0027108–09).  At the same time, the Canadian Nuclear Safety Commission conducted its own independent analysis and reached the same conclusions, determining in July 2015 that the transport containers met all Canadian regulatory requirements.  (AR 0026973–7022).

DOE issued another Supplement Analysis in 2015 (the "2015 SA") disclosing these U.S. and Canadian regulatory evaluations and approvals and determining again that it found nothing indicating a need to reassess its conclusions from the 2013 SA.  (AR 0027334–56).  The 2015 SA therefore concluded that any differences associated with transporting the target material in liquid rather than solid form "would be very low and not significantly different from the impacts reported in [the 1996 EIS]," and so neither a supplemental nor a new EIS was required under the CEQ's regulations or NEPA.  (AR 0027354).

Plaintiffs filed this litigation in August 2016, challenging DOE's determination that it did not need to issue a supplemental EIS or a new EIS before accepting the liquid target material.  DOE agreed to postpone shipment and transportation of the target material until mid-February 2017 in order to allow for the expedited resolution of this case.

## II.   LEGAL STANDARD

When reviewing motions for summary judgment in a suit seeking review of an agency's actions, the standard under Fed. R. Civ. P. 56(a) does not apply.  *Coe v. McHugh*, 968 F. Supp.

2d 237, 239 (D.D.C. 2013).  Instead, the court must decide as a matter of law "whether the

agency action is supported by the administrative record and otherwise consistent with the APA

standard of review."  *Id.* at 240 (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir.

1977)).  Pursuant to the APA, the court must set aside any agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  This same standard has been adopted for the narrower review of an agency's

obligations to prepare a new or supplemental EIS under NEPA.  *Marsh v. Ore. Nat. Res.*

*Council*, 490 U.S. 360, 376 (1989).

The court's review is "highly deferential" and begins with a presumption that the

agency's actions are valid.  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).

The court is "not empowered to substitute its judgment for that of the agency," *Citizens to*

*Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but instead must consider only

"whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment."  *Marsh*, 490 U.S. at 378 (quoting *Overton Park*, 401 U.S. at

416).  However, "courts should not automatically defer" to an agency's decision not to prepare a

supplemental EIS, and should "carefully review[] the record" and that ensure the agency made a

"reasoned decision."  *Id.*

## III.   DISCUSSION

### A.   Motions to Strike and Supplement the Record

Plaintiffs referenced and submitted certain extra-record materials in their cross-motion

for summary judgment.  Specifically, Plaintiffs submitted the Declaration of Gordon Edwards,

Ph.D. (ECF No. 16-1, corrected ECF No. 19-2), and the Declaration of Marvin Resnikoff, Ph.D.

(ECF No. 16-2), and they referenced and quoted from a 1972 report by the Atomic Energy

Commission.  (*See* Pls. Mem. at 11 n.8, 17 n.11).  After Plaintiffs filed their cross-motion for summary judgment, Defendants moved to strike these materials on the ground that courts should only review the administrative record before the agency at the time of its decision.  (ECF No. 21).  With their Reply brief, Plaintiffs moved to supplement the 27,000-page record to add these three additional documents.  (ECF No. 26).  The court GRANTS Defendants' Motion to Strike and DENIES Plaintiffs' Motion to Supplement.

When reviewing agency actions such as DOE's decision here, courts review "the whole record or those parts of it cited by a party."  5 U.S.C. § 706; *Overton Park*, 401 U.S. at 420 ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision.").  This record includes "all documents and materials that the agency directly or indirectly considered" before deciding what action to take.  *Pac. Shores Subdiv. v. U.S. Army Corps of Engr's*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (internal quotation omitted).  Judicial review is limited to the record because courts "should have before it neither more nor less information than did the agency when it made its decision."  *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997) (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)).  Agencies bear the burden of compiling the materials and documents it considered, either directly or indirectly, and the compiled record "is entitled to a strong presumption of regulatory."  *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010).

When, as here, a party seeks to add materials to the record that it does not contend the agency actually reviewed, courts only permit such additional extra-record evidence in three "unusual circumstances."  *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008). These include: (1) when "the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,'" (2) when "background information [is] needed 'to determine

9

whether the agency considered all the relevant factors,'" and (3) when "the 'agency failed to explain administrative action so as to frustrate judicial review.'"  *City of Dania Beach v. F.A.A.*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Am. Wildlands*, 530 F.3d at 1002).

       1.  <u>Plaintiffs' Submitted Declarations</u>

Plaintiffs first seek to supplement the record with two declarations that were not before DOE during its decision-making process but which Plaintiffs feel should nonetheless be considered by this court to demonstrate what Plaintiffs may have submitted if DOE engaged in a public notice and comment process while preparing a supplemental EIS.  Plaintiffs argue that these declarations fall under the second *Dania Beach* factor, under which extra-record evidence may be needed as background information.  The Resnikoff and Edwards declarations, according to Plaintiffs, expose factors that the DOE failed to consider in its decision not to prepare an EIS. The two declarations challenge DOE's conclusions as to the sufficiency of the casks used to transport the target material and the risks from potential fires or accidents, including an accident resulting in target material leaking into a reservoir, as well as the accuracy of DOE's calculations.

In the court's view, these two declarations are more akin to conflicting views of specialists, for which the Supreme Court in *Marsh* stated the agency "must have discretion to rely on the reasonable opinions of its own qualified experts."  490 U.S. at 379.  Because the declarations do not point to materials or evidence that Plaintiffs allege DOE should have considered and do not provide any background insight into the agency's decision-making process, the court will GRANT Defendants' motion to strike these declarations and DENY Plaintiffs' request to supplement the record with them.

2.  1972 Atomic Energy Commission Report

Plaintiffs also seek to supplement the record with the December 1972 AEC report titled "Environmental Survey of Transportation of Radioactive Materials to and from Nuclear Power Plants."  This report is referenced in the Nuclear Regulatory Commission's 1977 Environmental Impact Statement, which is a part of the administrative record.  Plaintiffs argue that the first two *Dania Beach* factors weigh in favor of including this report in the record because it provides background information and "is so fundamental a reference on the issue of radioactive materials transportation . . . that DOE's failure to review it can only be described as negligent."  (Pls. Rep. at 17).  Plaintiffs further state that "[t]he AEC Environmental Survey effectively repudiates DOE's assertion in the Supplement Analysis that the environmental difference between shipping target material in solid and liquid form is negligible."  (*Id.* at 18).

Based on the two quoted passages from the 1972 Report in Plaintiff's cross-motion, Plaintiffs appear to overstate the conclusions of the forty-five-year-old report.  The quoted passages speak to the risk and safety of transporting solid nuclear material, but are silent as to whether the environmental impacts of transporting liquid target material presents risks or environmental impacts that differ in a significant way from the transport of solid target material. It is not apparent from these passages why the 1972 Report would serve as crucial background information or, given the report's lack of specific analysis of target material in either solid or liquid form, why its omission from the record is a sign of DOE's negligence.  The court finds that neither of the *Dania Beach* circumstances are present here, and therefore Defendants' motion to strike is GRANTED and Plaintiffs' motion to supplement the record is DENIED.

**B.    Count II:  DOE's Decision Not to Prepare a Supplemental EIS**

DOE must prepare a supplemental EIS if it makes "substantial changes in the proposed

action that are relevant to environmental concerns" or there is "significant" new information or circumstances. 40 C.F.R. § 1502.9(c)(1). DOE's own regulations contain an analogous requirement, and further provide that "[w]hen it is unclear whether or not an EIS is required, DOE shall prepare a Supplement Analysis," which "shall discuss the circumstances that are pertinent to deciding whether to prepare a supplemental EIS" and "shall contain sufficient information to determine whether [a]n existing EIS should be supplemented." 10 C.F.R. § 1021.314(a), (c)(1), (2). Under this obligation, "only those changes that cause effects which are significantly different from those already studied require supplementary consideration." *Davis v. Latschar*, 83 F. Supp. 2d 1, 9 (D.D.C. 1998). DOE's decision whether to supplement an EIS "is mitigated, however, by a 'rule of reason.'" *Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 189 (D.C. Cir. 2013) (quoting *Deukmejian v. NRC*, 751 F.3d 1287, 1300 (D.C. Cir. 1984)). As a result, the agency's determination should be overturned only if the record reveals a "clear error of judgment," *Marsh*, 490 U.S. at 385, and the court is "obligated to 'defer to the wisdom of the agency, provided its decision is reasoned and rational,'" *Blue Ridge*, 716 F.3d at 195 (quoting *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009)). Even if DOE's decision rests on "predictive judgements" and "incomplete data," its determination is still "entitled to deference." *New York v. NRC*, 824 F.3d 1012, 1022 (D.C. Cir. 2016).

Pursuant to § 1021.314(c), DOE prepared two Supplement Analyses, in 2013 and 2015, to consider whether to prepare a supplemental EIS based on two primary changes from the 1995, 1996, and 2000 EISs: first, the transportation of liquid target material instead of solid, and second, the use of conventional processing at the Savannah River Site instead of melt-and-dilute processing. (AR 0026364–72, AR 0027336–38). Plaintiffs focus specifically on the plan to transport liquid target material, and the key—and really only—question in this case is whether

transportation of target material in liquid rather than solid form results in environmental impacts that are significantly different than those already evaluated, such that the preparation of a supplemental EIS is required.  Whether there are significant new circumstances is not a legal question, but a factual question for DOE to address.  *Marsh*, 490 U.S. at 377.

DOE's 2013 SA relies on the analysis and conclusions in the supporting Letter Report titled "Evaluation of Human Health Effects From Transportation of Fissile Solution Storage Tank Highly Enriched Uranium Solution."  The Letter Report, which focuses mostly on the use of conventional processing and storage at the Savannah River Site, details DOE's evaluation of radiological and non-radiological impacts from the transportation of the liquid target material in scenarios involving accidents or acts of sabotage or terrorism, or with no incidents at all.  (AR 0026379–89).  The evaluation "indicated that non-radiological accident risks, the potential for fatalities as a direct result of traffic accidents, present the greatest risks related to transportation of liquid HEU, but no traffic fatalities would be expected."  (AR 0026369–71).  It determined that the "overall impacts of transporting liquid HEU are very small and are less than those described in the [1996 EIS]," which considered transport of solid target material.  (AR 0026368).

After evaluating these risks and whether the differences between them and those considered by prior ESIs were significant, DOE concluded that there was not a substantial or significant difference between the environmental impacts here and those already considered by the earlier EISs to warrant a supplemental or new EIS for the planned shipment.  (AR 0026373).  In 2015, DOE again considered whether the effects of transporting liquid target material were substantially different from those associated with solid, and evaluated the new developments since its 2013 SA, including the certification of the NAC-LWT casks for transportation and the analyses and approvals by the NRC, DOT, and CNSC.  (AR 0027338–43).  DOE also reviewed

13

and evaluated CNSC's analysis as to the effects of land-based or aquatic accidents, compared this analysis with its own 2013 SA, and determined that both agencies agreed that risks of harm from the transportation were extremely low and not significantly different from the impacts already evaluated and reported in the 1996 EIS.  (AR 0027351–53).

In their Complaint, Plaintiffs assert that DOE failed to adequately consider numerous factors or issues: the "lack of viability for federal regulations" in the case of an extreme fire; the risk of transportation routes near water and elevated highways; the seriousness of accident scenarios; alternative options; the adequacy of the cask design; the potential for terrorist acts; the provisions for storage of the target material at the Savannah River Site; the historical problems with storage at the site; the details of processing; accidents at the Savannah River Site; exposure by transport workers and the public; new waste streams in the tank systems; the consequences of using the target material post-processing; and any unidentified or undisclosed costs involved. (Compl. ¶ 76).  Plaintiffs argue that DOE's analysis on this wide-ranging list of issues is insufficient primarily because of what Plaintiffs see as the "obvious difference" between liquid and solid target material.  (Compl. ¶ 55).  To Plaintiffs, the potential impacts of transportation of liquid target material must be significantly different than for solid material, requiring a supplemental EIS.  However, DOE has clarified that the "solid" target material that was evaluated in the 1995, 1996, and 2000 EISs was in the form of calcine or oxide powder, diminishing any "obvious" difference due to their similar risks of dispersal.  DOE contends that the agency in fact did analyze all the relevant factors, including exposure risks, accidents, terrorism or sabotage, and storage, in the 1995, 1996, and 2000 environmental impact statements, and the Supplement Analyses it performed in 2013 and 2015 informed its factual determination that the risks and impacts would not be significant different from those already considered for

the transportation of solid target material.

Plaintiffs also argue in their cross-motion that there is a "well-established and longstanding environmental conclusion and policy" that the transportation of liquid target material is too dangerous, such that DOE's planned transportation here warrants a supplemental EIS.  (Pl. Mem. at 2, 11, 21, 23).  As DOE counters, and as is evident by the documents Plaintiffs cite, no such policy exists.  In support, Plaintiffs rely exclusively on a single document it contends DOE should have given far more weight: a 1977 environmental impact statement prepared by the Nuclear Regulatory Commission.  While Plaintiffs concede that this EIS "did not compare the relative risks of shipping spent fuel and radioactive waste in solid and liquid form," they assert that the NRC still "deemed that shipping these materials in solid form was essential for minimizing environmental impacts," and that therefore shipping liquid material would be more dangerous.  (Pl. Mem. at 10).  Fatal to Plaintiffs' reliance on the 1977 EIS is that it did not evaluate target material at all, but rather more generally "the environmental impact of radioactive material shipments in all modes of transport."  (AR 0000001-0008).  The EIS does mention that potential consequences following an accident would be limited by the "nondispersible form" of radioactive material.  (AR 0000001-0009).  However, this stray conclusion, not specific to target material, is not evidence of a decades-long "policy," particularly in light of DOE's far more recent 1995, 1996, and 2000 environmental impact statements that evaluated and approved the transport of target material in powder form, which itself is also potentially dispersible.  This 1977 EIS is therefore not relevant to the factual question of whether the environmental impact of transporting liquid HEU instead of solid creates a significant difference or substantial change.[2]

---

[2]  Plaintiffs also rely on the 1972 AEC Report to argue for the existence of this long-standing policy, but for the reasons stated above, this report will not be considered by the court.

This court will only overturn DOE's decision not to prepare a supplemental EIS if the record shows a clear error of judgment or that DOE did not give the relevant evidence and factors a "hard look." *Marsh*, 490 U.S. at 378.  A review of DOE's two Supplement Analyses shows that the agency did, in fact, give a hard look to a wide range of factors, evidence, and statistical analyses regarding environmental impacts in numerous different scenarios, which allowed DOE to come to the conclusion that the environmental impacts were not significantly different from those already considered in its past environmental impact statements.  Plaintiffs disagree with DOE's conclusions and challenge the sufficiency and depth of its analyses, leading the court to view this case as akin to that considered by the Supreme Court in *Marsh*: "a factual dispute the resolution of which implicates substantial expertise . . . [and] [b]ecause analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'"  490 U.S. at 377 (quoting *Kleppe*, 427 U.S. at 412); *see also Blue Ridge*, 716 F.3d at 197.  The court therefore concludes that DOE has not acted arbitrarily or capriciously or made a clear error in judgment by deciding that its planned transport of highly-enriched uranyl nitrate liquid was not a substantial change from the actions evaluated by past environmental impact statements.  Defendants' motion is GRANTED as to Count II, and Plaintiffs' cross-motion is DENIED.

> ### C.      Remaining Counts

In their Complaint, Plaintiffs pleaded four additional claims.  These included allegations that DOE improperly failed to prepare an environmental assessment ("EA) in violation of NEPA (Count I); that DOE failed to prepare a programmatic EIS regarding repatriation of nuclear material from various countries, including Canada, Germany, and Indonesia, in violation of NEPA (Count III); that DOE's failure to publish an EA or supplemental EIS further violated the

Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, and Department of Energy Organization Act, 42 U.S.C. § 7112 (Count IV)[3]; and that this failure also violated the Administrative Procedure Act (Count V).  (Compl. ¶¶ 61–68, 79–93).  In their cross-motion, Plaintiffs do not specifically address any of these claims, and therefore DOE argues in its Reply that the court should treat them as conceded.  Plaintiffs clarify in their own Reply that it has not conceded these claims, but rather these claims are inter-related and require no additional analysis, as the court's conclusions with respect to Count II carry its conclusions as to the remaining claims.  (Pls. Rep. at 24–25).

Plaintiffs' Count III, alleging that DOE violated NEPA by failing to prepare a programmatic EIS, is tethered to Count II because the supplemental EIS Plaintiffs demand would be a supplement to the 1996 EIS, which was a programmatic EIS.  Similarly, Count IV alleges only that DOE has violated the Atomic Energy Act and the Department of Energy Organization Act "[b]y failing to comply with NEPA as alleged above" in Count II.  (Compl. ¶ 88).  Plaintiffs' APA claim in Count V also argues that DOE's alleged NEPA violation in Count II was arbitrary and capricious.  Because these claims rise and fall with the outcome of Count II, and the court granted summary judgment to DOE on this claim, then the court must conclude that DOE also prevails on Counts III, IV, and V, and summary judgment is granted in its favor on those claims.

With respect to Count I, alleging that DOE violated NEPA by failing to prepare an environmental assessment, DOE argued in its motion that it was not required to prepare an EA to determine whether to supplement an EIS, and it acted lawfully by instead following its own

---

[3]  The Atomic Energy Act authorizes DOE to regulate the possession and use of nuclear materials "to protect health or to minimize danger to life or property," 42 U.S.C. § 2201(b), and the Department of Energy Organization Act requires DOE to "assure incorporation of national environmental protection goals in the formulation and implementation of energy programs, and to advance the goals of restoring, protecting, and enhancing environmental quality, and assuring public health and safety," 42 U.S.C. § 7112(13).

regulations by preparing two Supplement Analyses.  Plaintiffs did not respond to this argument in their cross-motion or Reply, and the court agrees with DOE that as a result Plaintiffs have conceded this claim.  However, Plaintiffs' claim would nonetheless also fail as a matter of law. The CEQ's regulations state that "In determining whether to prepare an [EIS] the Federal agency shall (a) Determine under its procedures supplementing these regulations . . . whether the proposal is one which: (1) Normally requires an [ESI], or . . . (b) If the proposed action is not covered by paragraph (a) of this section, prepare an [EA]."  40 C.F.R. § 1501.4.  The court does not read this regulation to *require* an agency to prepare an EA to determine whether to supplement an EIS, but instead merely requires agencies to follow their own procedures to make this determination, and in the absence of such procedures, to then prepare an EA.  Because DOE followed its own regulation, which require a Supplement Analysis to make the determination whether to prepare a supplemental EIS, it did not violate any requirement under the CEQ's NEPA regulations.  The court therefore GRANTS DOE's motion as to Count I and DENIES Plaintiffs' cross-motion.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in full and Plaintiffs' cross-motion is DENIED in full.


Date:  February 2, 2017


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge